UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| Jacob Nocita and Nina Nocita,<br><br>     Plaintiffs,<br> v.<br><br>Andrea Leal, et al.,<br><br>     Defendants. | Case No. 3:22-cv-5741-TLF<br><br>ORDER ON SUMMARY JUDGMENT MOTIONS |

This matter is before the Court on Defendants Lieutenant Brian Dayton, Sergeant David Blundred, Sergeant Shane Krohn and Officer Christian Slater's (hereinafter, the "Officer Defendants") summary judgment motion (Dkt. 107) and Plaintiffs Jacob Nocita and Nina Nocita's summary judgment motions (Dkts. 101, 119). Plaintiffs brought this lawsuit under 42 U.S.C. § 1983 against the Officer Defendants for violating their Fourth Amendment rights. Dkt. 29 (Complaint).

The parties have consented to the jurisdiction of the undersigned Magistrate Judge. Dkt. 49.

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED. Plaintiffs' motions for summary judgment are DENIED; Plaintiffs' complaint is dismissed with prejudice.

## FACTUAL AND PROCEDURAL HISTORY

On January 2, 2020, the Hoquiam Police Department (HPD) received a bench warrant for the arrest of Plaintiff Nina Ellese Blanco issued by Hoquiam Municipal Court

ORDER- 1

#19-000086 for DV-Assault in the 4th degree. Dkt. 110 (Declaration of Sergeant David Blundred) at ¶ 3, Exhibit A. *See also* Dkt. 108 (Declaration of Audrey Murphy).

On February 16, 2020, Hoquiam Police Department received a Domestic Violence complaint regarding a couple screaming at each other at 107 Cub Lane, Hoquiam Washington. Dkt. 110 at ¶ 3; Exhibit A. Defendant Blundred was dispatched to respond at 11:47pm and arrived at the address with non-defendant Officer J. Gaddis. *Id.*

The officers could hear Mr. and Ms. Nocita yelling and screaming at each other when they arrived and tried to engage with them for about 15 minutes. *Id*. The officers gave Mr. and Ms. Nocita a verbal warning. Defendant Blundred returned to his vehicle and identified the male in the house as Jacob Nocita and the female in the house as Nina Nocita using his mobile data terminal. *Id.* Defendant Blundred conducted a warrant check on both individuals and discovered the warrant for Ms. Nocita. *Id.*

Upon knocking on their door again, Defendant Blundred advised Ms. Nocita that she had a warrant for her arrest. *Id.* Ms. Nocita allegedly stated that she was not Nina "Blanco." *Id.* Defendant Blundred and Officer Gaddis advised her she was under arrest on her warrant, advised her of her constitutional rights, and conducted a search of her person incident to her arrest. *Id.* Upon being transported to Hoquiam Jail, Ms. Nocita was fingerprinted and confirmed to be Nina Blanco. *Id.*

On March 14, 2020, the Department received another report, which "sounded like they had gotten physical," at 107 Cub Lane. Dkt. 110 at ¶ 4; Exhibit B. Defendant Blundred was dispatched along with non-defendants Officer Pearson and Officer Green to responded to the complaint. *Id.* When he arrived at the residence, Defendant Blundred states he knocked several times and directed anyone inside to come to the

ORDER- 2

door but received no response. *Id.* He opened the front door, which was unlocked, after waiting a few minutes and knocking multiple times. The officers saw Ms. Nocita standing at the top of the stairs and asked her if anyone else was in the residence; the officers alleged Ms. Nocita remained verbally unresponsive, so they conducted a sweep of the residence to confirm that no one else was found within. *Id.*

Defendant Blundred contacted PSO Swope and confirmed there was a valid no-contact order that specifically prohibited Ms. Nocita from "knowingly entering, remaining, or coming within 100 feet of 107 Cub Lane." *Id.* When asked whether she remembered being served with the order preventing her from being at the residence, Ms. Nocita stated "it was her residence 'too.'" *Id.* The officers then placed Ms. Nocita under arrest and into handcuffs for violating the DV No-Contact Order. *Id.* The officers later learned from the reporting witness that Mr. Nocita had left in a vehicle just prior to the officers' arrival, after witnesses heard yelling and crashing noises coming from the residence. *Id.* Ms. Nocita was transported and booked in the City of Hoquiam Jail on a Criminal Citation for Violation of a DV-No Contact Order. *Id.*

On April 13, 2020, Defendant Lieutenant Dayton was dispatched to 112 Eisenhower in Hoquiam, Washington, responding to report of a found child: Jacob Nocita's son. Dkt. 111 (Declaration of Lieutenant Brian Dayton) at ¶ 3. Lieutenant Dayton escorted the child back to 107 Cub Lane and found Jacob Nocita asleep on the couch. *Id.* at Exhibit A. The police report was forwarded to CPS for follow up. *Id.*

On May 5, 2020, Defendant Sergeant Shane Krohn stated he received a call from CPS for a welfare check at 107 Cub Lane, after CPS social worker Andrea Leal reported multiple attempts to contact Jacob Nocita -- to no avail. Dkt. 112 (Declaration

ORDER- 3

of Sergeant Shane Krohn) at ¶ 3; Exhibit A. When he arrived at the house to conduct the welfare check, Defendant Krohn states he noticed Ms. Nocita -- crouched inside the attached shed in violation of her no-contact order. *Id.* Defendant Krohn ran her name through dispatch, which confirmed there was a valid no-contact order in place. *Id.* Defendant Krohn placed her under arrest for violating the order. *Id.* Neither Jacob nor the children were at the residence. *Id.*

On June 2, 2020, Ms. Nocita pleaded guilty to felony violation of a DV no-contact order relating to the events on May 5, 2020, admitting she intentionally and unlawfully entered a residence from which she had been banned by court order. Dkt. 108, Exhibit A at 4.

Plaintiffs allege Jacob Nocita was unlawfully stopped on May 5, 2020, with his children, and forced to stay until CPS arrived. Dkt. 29 at 9; Dkt. 119 at 7.

Defendants allege they had no contact with Mr. Nocita or his children on that day. *See* Dkt. 112 at ¶4 ("I am not aware of any police contact by Hoquiam Police with Jacob Nocita or any of his children on May 5, 2020); Dkt. 111 at ¶4 ("I am unaware of any police contact with Jacob Nocita or the Nocita children on May 5, 2020"); Dkt. 109 at ¶4 ("I had no contact with Jacob Nocita or the Nocita children on May 5, 2020); Dkt. 110 at ¶6 ("I had no contact with Jacob Nocita or the Nocita children on May 5, 2020.).

Defendant Dayton was dispatched again to 107 Cub Lane for another domestic violence call on May 12, 2020. Dkt. 111 at ¶ 5. A neighbor called the police after she observed a dispute between Mr. and Ms. Nocita before Ms. Nocita climbed into Jacob Nocita's vehicle, a white Dodge Durango, and they through the neighbor's yard. *Id.* at Exhibit B. Defendant Dayton states that while driving to the residence, he passed by a

ORDER- 4

white Dodge Durango, ran a registration check, and was advised by Harbor 911 that the car was registered to someone else and had an expired registration. Dkt. 111, Exhibit B.

Defendant Dayton activated emergency lighting equipment and stopped the vehicle. He discovered Ms. Nocita was driving the vehicle. Defendant Dayton learned, after contacting Jacob Nocita, that Ms. Nocita had been at the residence all day prior to taking off with his car. Ms. Nocita was subsequently arrested and transported to Hoquiam Police Department for booking for violating the no-contact order based on the statements of the neighbor and Mr. Nocita. *Id.*

On July 2, 2020, Ms. Nocita was again arrested for Felony Domestic Violence Order Violation. Dkt. 109 (Declaration of Sergeant Christian Slater) at ¶ 3 Defendant Slater, who was familiar with Ms. Nocita and aware of her no-contact order, observed her entering 107 Cub Lane with her children, and he immediately conducted a check. Dkt. 109 at ¶3. The results showed a Grays Harbor County Misdemeanor warrant and the no-contact order relating to the 107 Cub Lane residence. *Id.*

Plaintiffs contend that the no-contact order expired on June 2, 2020; but the order states that it does not expire until 2022. Dkt. 119 at 4; Dkt. 119 at 12. Defendant Slater advised Dispatch, Defendant Blundred, and non-defendant Sergeant Mitchell, that he saw Ms. Nocita enter the residence in violation of the felony domestic violence order. Dkt. 109 at ¶3; Dkt. 110 at ¶ 7.

Sergeant Blundred states he knew Ms. Nocita to be uncooperative with law enforcement contacts, and conducted a separate check on Ms. Nocita, confirming a DV-No Contact order remained in the system at the 107 Cub Lane address and that she

ORDER- 5

had an outstanding warrant for DV-No Contact Order Violation & False Statement. Dkt. 110 at Exhibit D.

Both officers went to the residence, responding to the violation. *Id*. Sergeant Slater approached the main window and saw Ms. Nocita with her 3 children. Dkt. 109 at Exhibit A. He knocked on the window and requested that she come to the front door. *Id*. Ms. Nocita said, "no, I'm not coming out," and then proceeded to lock all the windows and doors. *Id*.

Anticipating possible flight, Sergeant Slater went to the back entrance -- while Sergeant Blundred went to the front door -- he heard Ms. Nocita barricading the front door. *Id*. Both officers attempted to speak to Ms. Nocita to no avail, and she denied being Nina Blanco. *Id*. The Officers determined they would enter the residence on the authority of Ms. Nocita's warrant and probable cause for Felony Domestic Violence No Contact Order Violation. *Id*. The officers advised Ms. Nocita she was under arrest on the authority of the warrant and Felony Domestic Violence No-Contact Order Violation and still did not cooperate. *Id*. The officers pushed open the back door of the residence and proceeded to the bedroom located on the east side of the residence, hearing Ms. Nocita within along with her children. *Id*.

The officers determined Ms. Nocita had locked the door and barricaded herself and her children in with a mattress pushed against the door, slamming the door in the officers' faces several times. *Id*. Eventually, the officers were able to put her in handcuffs and transported to the Hoquiam City Jail, having been arrested for violating the no-contact order. *Id*.

ORDER- 6

Officer Blundred was able to contact the children's grandmother to take care of the children. Dkt. 110 at Exhibit D. Officer Blundred took photos of the home and made a CPS referral in the matter. *Id*. Sergeant Slater prepared a Probable Cause Statement on July 2, 2020, summarizing the arrest. Dkt. 109 at ¶ 4.

On July 9, 2020, the Grays Harbor County Prosecuting Attorney confirmed Sergeant Slater's reports had been received and Ms. Nocita had been charged with Felony Violation of a No-Contact Order—Domestic Violence. Dkt. 109 at Exhibit B. On November 2, 2020, the court sentenced Ms. Nocita to 33 months in prison and 12 months community custody for this offense. *Id.*

Prior to Ms. Nocita's prison sentence, on July 24, 2020, Lieutenant Dayton was again dispatched to 107 Cub Lane for an agency assist response to take custody of the three Nocita children, complying with a court order. Dkt. 111 at Exhibit C. Upon arriving with CPS case worker Andrea Leal, Lieutenant Dayton advised Jacob Nocita they were taking custody of the children pursuant to a CPS order. *Id.* Jacob Nocita refused to get the children, stating, "you want them, you go get them," refusing to get any clothing or personal items for the children. *Id.* This removal was authorized by court order. Dkt. 53 (Declaration of Miles Russell).

Plaintiffs allege on May 5, 2020, Defendant Blundred unlawfully arrested and falsely imprisoned Ms. Nocita, and Defendant Dayton unlawfully detained Mr. Nocita and his children during a traffic stop. Plaintiffs further allege Defendants Slater, Krohn and Blundred "showed up" at their residence "without cause" and "without any warrants" on May 5, 2020, and July 2, 2020. Dkt. 29 at 9-10.

ORDER- 7

Grays Harbor Superior Court entered Shelter Care orders for the Nocita's minor children on July 25 and August 4, 2020, in Grays Harbor County. Dkt. 53 (Declaration of Miles Russell) at Exhibit B. The Grays Harbor County Superior Court entered Orders of Dependency for these children on April 8 and May 5, 2021. *See* Dkt. 53 at Exhibit C. The Orders of Dependency were affirmed by the Washington State Court of Appeals – Division II on February 1, 2022. *Id*.

On August 28, 2022, the Department of Children, Youth, and Families filed termination petitions for the Nocita's children, in Grays Harbor County *See* Dkt. 53 at Exhibit D. As of June 2023, the Nocita's parental rights remain intact, pending the outcome of the termination trials and the Dependency cases. *Id*. Plaintiffs in this case request injunctive relief -- that their children be returned home -- and damages. Dkt. 29 at 19.

## DISCUSSION

A. Summary Judgment Standard

Summary judgment is supported "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure (FRCP) 56(c). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A genuine dispute concerning a material fact is presented when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of

ORDER- 8

the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

When the Court considers a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.,* at 255. Yet the Court is not allowed to weigh evidence or decide credibility. *Anderson,* 477 U.S. at 255. If the moving party meets their initial burden, an adverse party may not rest upon the mere allegations or denials of his pleading; his or her response, by affidavits or as otherwise provided in FRCP 56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2). The Court may not disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

In response to the motion for summary judgment, the nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

Courts have a duty, however, to construe pro se pleadings liberally, including pro se motions and complaints. *Karim–Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 623 (9th Cir.1988) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt.").

ORDER- 9

The Officer Defendants request that the Court strike Plaintiffs' second motion to amend their summary judgment motion (Dkt. 119) because Plaintiffs simultaneously have their first summary judgment motion (Dkt. 101) pending before the Court. Under Local Civil Rule ("LCR") 7(e)(3), parties are prohibited, absent leave of the court, from filing "contemporaneous dispositive motions, each one directed toward a discrete issue or claim." This rule serves to prevent a single party from filing contemporaneous motions to circumvent the page length requirements governing dispositive motions. *See* LCR 7(e). Given the Court's duty to construe pro se motions liberally, and that Plaintiffs' motions combined do not exceed the page length requirements under LCR 7(e)(3), the Court will consider both of Plaintiffs' motions and the attached declarations and exhibits to their second motion for summary judgment.

The Court, however, declines to allow plaintiff to raise any *new* theories of liability in their summary judgment motions that were not included as claims in the complaint. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (finding that the plaintiff failed to provide adequate notice of a different theory of liability under the ADA); *Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.").

Plaintiffs raised claims under the Washington State Constitution and made references to RCW 9A.76.020 and state common law in their summary judgment motions – these claims were *not* pled in their operative complaint (Dkt. 29). The Court will confine its analysis to the Fourth Amendment claims raised in Plaintiffs' complaint.

B.  Qualified Immunity Under 42 U.S.C. § 1983

ORDER- 10

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct complained of was committed by a person acting under color of state law, and (b) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

Government officials are entitled to qualified immunity in suits against them for an alleged violation of a constitutional right unless a plaintiff makes a two-part showing. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The plaintiff must show that officials violated a constitutional right *and* that this right was "clearly established." *Id*. A court may consider the two prongs in whatever order it chooses. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the plaintiff with respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam). If there is a genuine issue of material fact concerning both: (1) Whether the defendant's conduct violated a constitutional right and (2) Whether it would be clear to a reasonable officer that their conduct was unlawful under the circumstances they confronted, then summary judgment granting qualified immunity is not appropriate. *Bonivert v. City of Clarkston,* 883 F.3d 865, 871-72 (9th Cir. 2018).

As discussed below, viewed in light most favorable to the Plaintiffs, the facts do not show that the Officer Defendants' acts violated Plaintiffs' Constitutional rights.

ORDER- 11

Accordingly, the Defendants are entitled to qualified immunity because the first prong of the qualified immunity test is not satisfied.

### C.  Rooker-Feldman Doctrine

Defendants first assert that the *Rooker-Feldman* doctrine bars Plaintiffs' claims and request for relief. If the doctrine applies, the Court lacks subject matter jurisdiction over the claim and can neither grant nor deny summary judgment. *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482–86 (1983).

The *Rooker-Feldman* doctrine requires dismissal of *de facto* appeals of state court judgments, which federal district courts have no jurisdiction to hear. Such appeals are insupportable *de jure*, as the United States Supreme Court is the only federal court with appellate jurisdiction over state courts' judgments. *See* 28 U.S.C. §§ 1257(a), 1331. The doctrine, therefore, prevents litigants from taking an appeal by calling it a lawsuit.

First, *Rooker-Feldman* applies to cases where the party who did not prevail in state court is "complaining of injuries caused by state-court judgments rendered before the [federal] district court proceedings commenced and inviting [federal] district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus., Inc.*, 544 U.S. 280, 284 (2005) (emphasis added). The Supreme Court holds that *Rooker-Feldman* does not apply to federal actions commenced while state court actions are pending, even if the state court enters judgment before the federal action is resolved. *See id*. at 292. Nina Nocita's arrests and subsequent cases in Hoquiam Municipal Court (occurring in 2020), and the dependency hearings of the Nocita's children from 2020 to

ORDER- 12

August 2022 occurred prior to Plaintiffs filing the instant action in Federal Court in October 2022.

Second, Plaintiffs seek to "challenge [the] state court's factual or legal conclusion," *Manufactured Home Communities Inc. v. City of San Jose*, 420 F.3d 1022, 1030 (9th Cir. 2005), and essentially ask this Court to declare the state court's decision "null and void," *see Rooker*, 263 U.S. at 414. The Nocitas specifically seek, in relevant part, injunctive relief by this Court that Washington return their children to their custody. Because Plaintiffs are challenging the State Court's decision regarding the Nocitas' parental rights, Plaintiffs' requested relief in this Court is barred by the *Rooker-Feldman* doctrine. This Court lacks subject matter jurisdiction over the claim and can neither grant nor deny summary judgment. *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482–86 (1983).

The Court, in an abundance of caution, and considering the uncertainty of the status of Plaintiffs' parental rights at this time, will make a ruling in the alternative and consider the Plaintiffs' and Officer Defendants' summary judgment motions on Plaintiffs' Fourth Amendment claims as well.

D. Decision (in the Alternative, Assuming Jurisdiction Exists) on Plaintiffs' Fourth Amendment Claims

　　1. Nina Nocita's Arrests

Plaintiffs asserts that on each occasion Ms. Nocita was arrested for violating the protection order, Defendants did not have probable cause to arrest her.

ORDER- 13

1    " 'Probable cause exists when there is a fair probability or substantial chance of
2    criminal activity.' " *United States v. Soriano,* 361 F.3d 494, 505 (9th Cir.2004) (quoting
3    *United States v. Bishop,* 264 F.3d 919, 924 (9th Cir.2001)). "It is well-settled that 'the
4    determination of probable cause is based upon the totality of the circumstances known
5    to the officers at the time of the search.' " *Id.* (quoting *Bishop,* 264 F.3d at 924).

6        The Officer Defendants had probable cause to arrest Ms. Nocita on March 14,
7    2020, May 5, 2020, May 12, 2020, July 2, 2020, and February 4, 2023. Defendants
8    Blundred, Krohn, and Slater contacted a dispatcher to ascertain whether there was a
9    valid no-contact order that specifically prohibited Ms. Nocita from "knowingly entering,
10   remaining, or coming within 100 feet of 107 Club Lane." *See* Dkt 110 at Exhibit B; Dkt.
11   112 at Exhibit A, Dkt. 109 at Exhibit A, Dkt. 108 at Exhibit E. Defendant Dayton, on May
12   12, 2020, relied on his prior knowledge and familiarity with Ms. Nocita and the contents
13   of the protective order, and the statement from Jacob Nocita confirming that Ms. Nocita
14   had been at the residence. Dkt. 111 at ¶5. In each instance of Ms. Nocita's arrest, the
15   Officer Defendants had probable cause to arrest her based upon the totality of
16   circumstances known to the officers at those times.

17       Plaintiffs further contend that the no-contact order was for Nina Blanco and not
18   Nina Nocita – Nina Blanco and Nina Nocita, however, were determined by the
19   Defendants, based on their investigation, to be the same person as confirmed in various
20   parts of the record as well as other Court dockets. *See* Dkt. 110 at Exhibit A ("Nina
21   Blanco was transported to Hoquiam Jail where she was fingerprinted further confirming
22   her identity."); Dkt. 108 at Exhibit C (Bench Warrant, City of Hoquiam); *State of*

ORDER- 14

*Washington v. Nina Ellese Nocita AKA Blanco*, No. 19-1-00601-6 (Wash. Super. Mar. 29, 2019)[1].

Even assuming, for purposes of this analysis, the Officer Defendants arrested Ms. Nocita without probable cause, "the officer[s] may still be immune from suit if it was objectively reasonable for [them] *to believe* that [they] had probable cause." *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1078 (9th Cir. 2011) (emphasis in original). "The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand." *Id.* In *Rosenbaum,* the Ninth Circuit framed the reasonableness question as "whether *all* reasonable officers would agree that there was *no* probable cause" under the then-existing circumstances. *Id.* (emphasis added).

Plaintiffs fail to show the existence of a genuine question of material fact about whether *all* reasonable officers would agree that there was no probable cause to arrest Ms. Nocita when (1) the Municipal Court issued a domestic violence no contact order prohibiting Ms. Nocita from knowingly entering, remaining, or coming within 100 feet of the residence, (2) the no-contact order was still active; and (3) Ms. Nocita was found either in the house or right outside of the house during each instance the Officer Defendants were called to the residence. Taking these facts, even in the light most reasonable to Plaintiffs, the Court finds that most, if not all, reasonably competent police officers would believe there was a fair probability that Ms. Nocita committed a crime by violating the terms of the domestic violence protective order.

---

[1] The Court can take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan,* 508 F.3d 1212, 1225 (9th Cir.2007)

ORDER- 15

Thus, Plaintiffs' motion for summary judgment on their Fourth Amendment false arrest claim is DENIED; Defendants' motion for summary judgment on this claim is GRANTED.

### 2. Jacob Nocita's Traffic Stop

Plaintiffs allege non-defendant Officer Simpson stopped Jacob Nocita and his children on their way home from the lake on May 5, 2020, and surrounded his vehicle until a sergeant and social worker arrived. Dkt. 119 at 7. Mr. Nocita alleges Officer Simpson pulled him over to inform him that officers were dispatched to his residence for a welfare check. *Id.*

Mr. Nocita states Defendants Dayton and Blundred were in a separate vehicle that was pulled over to the side of his car. *Id.* Both Defendants Dayton and Blundred state they did not have any interactions with Jacob Nocita or his children on May 5, 2020. Dkt. 110 at ¶6; Dkt. 111 at ¶4. It is undisputed that law enforcement was contacted on May 5, 2020, to conduct a welfare check at Plaintiffs' residence. Dkt. 112 at ¶3; Dkt. 119 at 7.

Plaintiffs have not shown that either Defendants Dayton or Blundred personally participated in "seizing" Mr. Nocita or his children in violation of the Fourth Amendment. A defendant is liable under § 1983 "only upon a showing of [his] personal participation." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Defendants Dayton and Blundred state they did not interact with Mr. Nocita or his children on May 5, 2020. Considering the assertions in Mr. Nocita's declaration, he alleges Defendants Dayton and Blundred were near his vehicle, but he does not allege Defendants Dayton and Blundred were involved in pulling Mr. Nocita's vehicle over, or inform him of the welfare check, and he

ORDER- 16

does not allege they were the officers who asked Mr. Nocita to remain there until the sergeant and social worker arrived. Dkt. 119 at 7. Plaintiffs have failed to show that Defendants Dayton and Blundred personally participated in the alleged Fourth Amendment violation.

Plaintiffs' motion for summary judgment on their Fourth Amendment seizure claim is DENIED; Defendants' motion for summary judgment on this claim is GRANTED.

### 3. Welfare Checks

On May 5, 2020, and July 2, 2020, the Officer Defendants entered Mr. Nocita's residence to arrest Ms. Nocita for violating the no-contact order. Dkt. 119 at 7, 9.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted); *see also Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").

The Fourth Amendment allows police to conduct a warrantless search of a person's home only if the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403. One exigency, the emergency aid exception, permits law enforcement officers to enter a home without a warrant to assist an "injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403.

ORDER- 17

A warrantless entry for emergency aid "is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action." *Bonivert*, 883 F.3d at 876-77 (citing *Brigham City*, 47 U.S. at 404) (emphasis and alteration in original, internal quotation marks omitted). The reasonableness of the action addressing the emergency situation is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014).

Here, the Officer Defendants responded to a call from Child Protective Services for a welfare check on May 5, 2020, after the social worker was unable to reach Mr. Nocita despite multiple attempts. Defendant Krohn responded to the call and found Ms. Nocita outside the house, crouching inside the attached shed in violation of the no-contact order. Defendant Krohn searched the inside of the residence for the sole purpose of checking to see if Plaintiffs' children were in the house. Under the totality of the facts concerning Ms. Nocita's having been the subject of a bench warrant in January 2020 and her previous arrests in February and March 2020 for domestic violence behavior, and in light of the social worker being unable to contact Mr. Nocita, as well as the Defendants having noticed Ms. Nocita hiding in the shed in violation of the no-contact order, it was not objectively unreasonable for the officers to believe that a brief warrantless entry into Plaintiffs' home was necessary to ensure that no occupant, i.e., the children, needed assistance or faced an imminent threat of injury.

Similarly, on July 2, 2020, Defendant Slater observed Ms. Nocita entering the residence with her children and confirmed she was in violation of the no-contact order.

ORDER- 18

Ms. Nocita did not comply with the Defendants' request to come to the front door; instead, Ms. Nocita locked the windows and doors and barricaded the front door. Once again, under the totality of the undisputed facts -- and in light of the January 2020 bench warrant, previous domestic violence arrests in February and March 2020, Ms. Nocita's initial refusal to cooperate with orders by the officers to exit the residence and the inability of the officers to see what was happening inside the residence -- it was not objectively unreasonable for the officers to believe that a brief warrantless entry into her home was necessary to ensure that no occupant remaining in the house was in need of assistance or faced an imminent threat of injury from another person in the residence.

Accordingly, the Court finds that Plaintiffs have failed to raise a genuine dispute of material fact as to whether, at the time the officers entered Plaintiffs' residence during the May 5, 2020 and July 2, 2020 incidents, it was objectively reasonable for the Officer Defendants to believe that it was necessary to enter Plaintiffs' home without a warrant to ensure that no occupant of the residence was in danger of "imminent injury" or in need of "emergency assistance." *See Bonivert*, 883 F.3d at 876-78.

## CONCLUSION

Based on the foregoing discussion, the Court finds Plaintiffs did not raise a genuine dispute of material fact sufficient to grant their summary judgment motions and defeat Defendants' summary judgment motion. The Court's primary decision is that, under the Rooker-Feldman doctrine, the Court lacks subject matter jurisdiction. As an alternative decision, the Court grants summary judgment in favor of the defendants on the basis that the Defendants are entitled to qualified immunity because plaintiff has

ORDER- 19

failed to show a genuine dispute of material fact that any constitutional violation was committed by the Defendants.

Thus, under the primary holding of the Court, this case is dismissed with prejudice for lack of subject matter jurisdiction.

Under the alternative holding of the Court, Plaintiffs' summary judgment motions (Dkts. 101, 119) are DENIED, Defendants' motion for summary judgment is GRANTED (Dkt. 107), and the Court dismisses Plaintiffs' complaint with prejudice.

Dated this 28th day of June, 2024.

Theresa L. Fricke
United States Magistrate Judge

ORDER- 20